OPINION
{¶ 1} Plaintiff-appellant Brady Inman, III appeals from the July 27, 2005, Judgment Entry of the Delaware County Court of Common Pleas affirming the Magistrate's Decision.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On May 3, 2004, appellant Brady Inman, III filed a complaint against appellee Tina Baker in the Delaware County Court of Common Pleas. Appellant, in count one of his complaint, alleged that between March 14, 2003, and March 21, 2003, appellee induced appellant to transfer $17,520.00 to her to pay her personal expenses "in reliance upon her [appellee's] representations that their personal relationship would improve if she did not have financial problems and should their relationship not succeed, she would repay him the funds." Appellant further alleged, in count one, that appellee, between March 21, 2003, and August 7, 2003, obtained $160.00 from appellant without his knowledge or consent. With respect to count one, appellant demanded judgment against appellee in the amount of $17,680.00.
 {¶ 3} In count two of his complaint, appellant alleged that, in February and March of 2003, he was fraudulently induced to transfer a total of $17,520.00 to appellee based on appellee's representations that her financial pressures affected their relationship and that "relief of such pressures would eliminate the stresses in their relationship and would make a permanent relationship between them possible." While appellant, in count three of his complaint, alleged that appellee had made representations to him for the purposes of obtaining funds and that he received no value in exchange for the funds, appellant's fourth cause of action was for declaratory judgment. Appellant, in count four specifically sought a judgment from the trial court that the within civil case did not constitute a violation of a civil protection order issued in another case barring contact between appellant and appellee for a period of five years.
 {¶ 4} On June 11, 2004, appellee filed an answer and counterclaim. Appellee, in her counterclaim, alleged that appellant was unjustly enriched. Appellee specifically alleged that appellant had cohabited with her in her home from January of 1999 through June of 2003 and that, since appellant was unemployed in 1999, 2000 and 2001, appellee paid in excess of $25,000.00 towards appellant's living expenses during 1999 through 2002. Appellee further alleged that appellant had agreed to repay such money and had breached such contract and that such money was a loan.
 {¶ 5} A trial before a Magistrate was held on January 27, 2005. The following testimony was adduced at the trial.
 {¶ 6} Appellant and appellee began cohabitating in late 1997. In February of 2002, the two separated and then reconciled again in May of 2002, before separating again in November of 2002. Appellant then moved back into appellee's house again in February of 2003.
 {¶ 7} At trial, appellant testified that he had dinner with appellee on May 30, 2003, and that the two decided to permanently terminate their romantic relationship at that time. According to appellant, several months earlier, he had agreed to loan appellee $17,500.00 to pay off her credit card debt for purpose of making their relationship better. Appellant testified that, on May 30, 2003, appellee "said there was no problem with that; she would pay it to me as soon as possible, even if it was necessary for her to refinance her house." Transcript at 9. Appellant testified that he was expecting to have his money repaid within three months.
 {¶ 8} Appellant further testified that, in mid-August of 2003, when he asked appellee about the debt, she told him that she was not in a position to repay the same at such time. The following is an excerpt from appellant's trial testimony:
 {¶ 9} ". . . And November — no, October, about the second week of October, I called her and I asked her to repay the debt. She said she would have to look at her finances to see if she was capable at that time of doing that. I asked her how long that period of time might be. I think she indicated it would be a couple of weeks. After a couple of weeks, I had no contact with her. I began calling. I finally did get in touch with her. She indicated that she didn't want to talk about it; she had sent me an e-mail that would tell me what her decision about the debt was. . . .
 {¶ 10} "A. At the time that we talked in October, Tina had indicated that she had sent this e-mail. I explained to her that I was not living at my mother's house. My computer was in storage; I did not have access to an e-mail. She insisted that it was in the e-mail; I insisted that she tell me what her decision was. She finally indicated that she was not going to repay the debt and that everything was detailed in the e-mail and she cut the conversation off.
 {¶ 11} "Sometime later, I got my computer put together and I drew the e-mail, but I was unable because I didn't have the capability of getting the spread sheet that is attached. The spread sheet was actually pulled up sometime later when I was able to get the program that the spread sheet was written in. But basically, that was the reason for my believing that there was definitely a promise to pay and definitely an intent on her part to pay originally until for whatever reason, she decided she didn't want to pay." Transcript at 10-11.
 {¶ 12} Appellee, in her October 22, 2003, e-mail to appellant, which was admitted into evidence at trial, stated, in relevant part, as follows:
 {¶ 13} "After reviewing this [spreadsheet], you should consider yourself lucky, and this does not take into account the cell phone, which cost me $65.00 per month! I supported you for 36 months from July 1999 to May 2002 and the whole time I defended you to my friends, and my family, time and time again. But I was willing to give you a break, because I felt sorry for you. As six months turned into a year and then two years and finally three — I realized you were doing nothing more than taking advantage of the situation. And the icing on the cake, you were taping my conversations, breaking into my house and who knows what other illegal activities. You make me so angry, I can't believe I let you back into my life last spring, but in doing so — I found out what kind of person you really are and I don't want anything to do with you so — walk away and leave me alone."
 {¶ 14} On cross-examination, appellant admitted that there was no written agreement or any other type of written documentation memorializing appellee's alleged agreement to repay the money to him.
 {¶ 15} At the conclusion of appellant's testimony, the trial court dismissed count three of appellant's complaint (fraud) while count four (declaratory judgment) was withdrawn by appellant.
 {¶ 16} Appellee was the only other witness to testify at trial. Appellee testified that, in 2003, she opened a joint savings account with appellant using a cashier's check from appellant[1] and that, in March of 2003, funds were withdrawn from such account and transferred into appellee's checking account to pay off the parties' joint credit card debt. She further testified that she used credit cards to pay for appellant's living expenses since appellant was unemployed during much of their relationship. The following testimony was adduced when appellee was asked whether appellant ever indicated that the funds withdrawn from the parties' joint savings account in March of 2003 were to be used for anything other than paying for credit card debt that the two had incurred while living together:
 {¶ 17} "Q. Were there any conditions, either explicit or implied upon the removal of those funds in the savings account?
 {¶ 18} "A. No, there was not.
 {¶ 19} "Q. Did you ever promise to repay the plaintiff or pay the plaintiff for any of those funds?
 {¶ 20} "A. No, I did not.
 {¶ 21} "Q. With regards to that, was there ever — there was earlier some testimony by the plaintiff that there was an agreement between the two of you. Was there ever any kind of writing that was done to memoralize anything with regards to the funds in March of '04? [sic]
 {¶ 22} "A. No, there was not." Transcript at 62-63. Appellee further testified that she never made any oral promise on May 30, 2003, to repay appellant.
 {¶ 23} On cross-examination, appellant attempted to impeach appellee with her transcript testimony from another case, which was a civil protection case. The following is an excerpt from the January 27, 2005, trial:
 {¶ 24} "Q. Okay. Do you recall we were here about 15 months ago on your request for a civil protection order?
 {¶ 25} "A. Correct.
 {¶ 26} "Q. And you testified on that date, my question to you, `and in the course of your terminating this relationship you agreed to repay the money to Brady; didn't you?' Page 39, you said — you answered, `I agreed to look at my finances and see if I could.'
 {¶ 27} "THE COURT: Are you reading a transcript?
 {¶ 28} "MR. SAKER: The transcript was filed in the court's file in the civil protection case." Transcript at 69-70. The Magistrate sustained appellee's objection to such testimony since the transcript from the civil protection case was not filed in the case sub judice.
 {¶ 29} At the conclusion of the trial, the Magistrate stated, in relevant part, as follows:
 {¶ 30} "As it relates to the complaint on behalf of Mr. Inman, I find that the evidence fails to prove that there was any type of agreement between the parties that this money was a loan to be repaid. Specifically, there was no loan documents, such as a note signed by the parties; there was nothing in writing and signed by the parties to clarify what this was. I also find it inconsistent that the actions are consistent with it being a loan and I don't understand why the plaintiff would loan his basically, only remaining asset to someone that he had an unstable relationship with, I believe the testimony was, this was the third reconciliation without written documentation as to what this was exactly. So I don't find a promise; I don't find any mutual agreement. This is also in a joint account. So I find nothing in the evidence that leads me to the conclusion that this was a loan. So as far as the plaintiff's claims, Mr. Inman, those are denied." Transcript at 83-84. A Magistrate's Decision was filed on February 14, 2005. The Magistrate, in her decision, recommended that judgment be granted in favor of appellee and that appellant's complaint be dismissed. With respect to appellee's counterclaim the Magistrate further recommended that judgment be granted in favor of appellant and the counterclaim be dismissed.
 {¶ 31} On February 28, 2005, appellant filed objections to the Magistrate's Decision. Appellant, in his objections, argued that the evidence that he presented at trial established all of the elements of his claim for detrimental reliance/promissory estoppel and his claim that the funds appellee obtained from him were a loan that appellee promised to repay. Appellant further argued that the Magistrate erred in excluding appellee's transcript testimony from the civil protection case.
 {¶ 32} As memorialized in a Judgment Entry filed on July 27, 2005, the trial court overruled appellant's objections and affirmed the Magistrate's February 14, 2005, Decision.
 {¶ 33} Appellant now raises the following assignments of error on appeal:
 {¶ 34} "I. THE TRIAL COURT ERRED IN ADOPTING THE MAGISTRATE'S REPORT.
 {¶ 35} "II. THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S COMPLAINT."
 I, II {¶ 36} Appellant, in his two assignments of error, argues that the trial court erred in adopting the Magistrate's Decision and in dismissing appellant's complaint. We disagree.
 {¶ 37} Appellant initially argues that, at the trial in this matter, he established all of the elements of his claim for detrimental reliance/promissory estoppel.
 {¶ 38} The Ohio Supreme Court has adopted the doctrine of promissory estoppel that was set forth in the Restatement of the Law 2d, Contracts (1981), Section 90: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." See Ed Schory Sons, Inc. v. Soc. Natl. Bank, 75 Ohio St.3d 433, 439,662 N.E.2d 1074, 1996-Ohio-1074. To be successful on a claim of promissory estoppel, "[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." Ohio State Bd. of Pharmacy v. Frantz (1990),51 Ohio St.3d 143, 145, 555 N.E.2d 630.
 {¶ 39} Appellant, in the case sub judice, argues that there was sufficient evidence, based on his testimony and the e-mail sent to him by appellee, which is cited above, that he loaned money to appellee in reliance on her promise to repay the same and that he was damaged as a result. Appellant further argues that he loaned such money to appellee with the understanding that, by alleviating appellee's financial problems, their personal relationship would improve.
 {¶ 40} However, at the trial in the matter, appellee denied that she ever agreed to repay the money to appellant. While appellant argues that appellee was not credible, we note that the Magistrate, as trier of fact, was in the best position to assess appellee's credibility. See, for example, Ciesielczyk v. Ogg,
Stark App. No. 2000CA00359, 2001 WL 967896. Cleary, the Magistrate found appellee to be more credible than appellant. Furthermore, we note that there was no written note or any other type of documentation between the parties establishing that appellant loaned the money to appellee and that appellee agreed to pay the same. As noted by the trial court in its July 27, 2005, Judgment Entry, the e-mail from appellee to appellant "does not contain any admission by the Defendant [appellee] that she agreed to a `loan.'"
 {¶ 41} Appellant further argues that he produced sufficient probative evidence in support of his claim that he loaned appellee the money. Appellant contends that his own testimony, coupled with appellee's own admissions in her e-mail constitute sufficient probative evidence.
 {¶ 42} However, we concur with the trial court that appellant failed to meet his burden of proof on such issue since there is no evidence corroborating appellant's testimony, which was contradicted by appellee, that the parties intended the money to be a loan. While appellant takes issue with the trial court's finding that the Magistrate's decision not to allow the introduction of the transcript from the parties' civil protection case was harmless error, we disagree. As noted by the trial court, appellant's counsel was able to question appellee from the transcript of the civil protection hearing "where the Defendant stated that she "AGREED TO LOOK" at her finances, and see if she could repay." We further concur with the trial court that the fact that appellee agreed to look at her finances to see if she could repay appellant was not the same as acknowledging that the money was, in fact, a loan.
 {¶ 43} Based on the foregoing, we find that the trial court did not err in adopting the Magistrate's Decision and in dismissing appellant's complaint. We concur with the trial court's finding that appellant failed to establish all of the necessary elements for his claim of detrimental reliance/promissory estoppel and his claim that the money appellee received from him was intended to be a loan.
 {¶ 44} Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.
By: Edwards, J. Gwin, P.J. and Boggins, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Delaware County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Appellant, on cross-examination, testified that he deposited $28,500.00 from a settlement that he had received into the joint savings account.